NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-447

STATE OF LOUISIANA

VERSUS

REGINALD K. JACKSON

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 20-K-1596-B
HONORABLE ADAM GERARD CASWELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

CANDYCE G. PERRET
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, John E. Conery, and Candyce G. Perret, Judges.

AFFIRMED.

G. Paul Marx
Louisiana Appellate Project
Post Office Box 82389
Lafayette, LA   70598
(337) 237-2537
COUNSEL FOR DEFENDANT APPELLANT:
    Reginald K. Jackson

Reginald K. Jackson
Dixon Correctional Institute
Post Office Box 788
Jackson, LA   70748-0788
IN PROPER PERSON

Chad Patrick Pitre
District Attorney
27th Judicial District
Kathleen E. Ryan
Assistant District Attorney
Post Office Box 1968
Opelousas, LA   70571
(337) 948-8984
COUNSEL FOR APPELLEE
    State of Louisiana

**PERRET, Judge.**

Defendant, Reginald K. Jackson, was convicted by a jury on October 28, 2021, of second degree rape, a violation of La.R.S. 14:42.1, and sentenced to thirty five years at hard labor; the first ten years to be served without the benefit of probation, parole, or suspension of sentence, but he was given credit for time served. Defendant is now before this court alleging insufficiency of the evidence along with numerous evidentiary claims. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND:**

The victim in this case, C.B.,[1] alleged that her father raped her in his home after the two returned from purchasing her a car. While C.B. was looking through the mail, Defendant came behind her and pulled her pants and underwear down. He then pulled her from the kitchen to the living room where he sat down and pulled C.B. on top of his lap and they had intercourse. Although Defendant did not make any threats against C.B., and C.B. admits she did not resist, C.B. told Defendant it felt like rape and later testified she felt as though she would have been in physical danger had she resisted him.

The following day, C.B. took Defendant to an appointment. During the car ride, C.B. recorded her conversation with Defendant to obtain proof that the offense took place. C.B. was concerned no one would believe her. After she obtained the recording, C.B. contacted the police and an investigation ensued.

On July 8, 2020, the State filed a bill of information alleging Defendant, Reginald K. Jackson, committed second degree rape upon "A.P." without consent of the victim because she was prevented from resisting by force or violence where she

---

[1] The initials of the victim are used pursuant to La.R.S. 46:1844(W).

reasonably believed such resistance would be useless in violation of La.R.S. 14:42.1(A)(1). The alleged date of the offense is April 29, 2020. On October 13, 2021, the State subsequently filed a bill of information, stamped as a clarified bill, charging Defendant with the same statute but changed the victim's name to C.B.

On July 9, 2020, Defendant waived formal arraignment and entered a plea of not guilty. On October 26, 2021, Defendant proceeded to trial, and the jury reached a unanimous verdict of guilty as charged on October 28, 2021. On November 21, 2021, the trial court sentenced Defendant to thirty-five years at hard labor with the first ten years to be without benefits.

On appeal, Defendant asserts three assignments of error with subparts as follows:

> 1. The evidence in this case was insufficient to prove the elements of second-degree rape. There is no evidence of "threats or use of force". Fear is not an element of the offense of second-degree rape. Counsel did not object to an erroneous instruction that left out 14:43(a)(4) which explains that third degree rape is simply "without consent".
>
> 2. Admission of unsworn testimony, hearsay, and character evidence cumulatively prejudiced Reginald Jackson's right to a fair trial as to require reversal. Counsel failed to raise a single objection, and therefore the prejudice is a result of ineffective assistance of counsel.
>
> > A. Improper Argument by the Assistant District Attorney that the only way to avoid conviction was for the defendant to lie about consent or intercourse.
> >
> > B. Admission of exculpatory statements by Reginald Jackson which the State used to attack the character of appellant based on his interest in a "singles club";
> >
> > C. Admission of a charge of Manslaughter filed against appellant, untried, and unrelated to any consideration as 404B "Other Crimes", without any similarity or value other than to attack the character of Appellant;
> >
> > D. Admission of an audio recording of Appellant,

made by the victim, which although it included inculpatory statements also was primarily a character attack on Reginald Jackson.

3.    Introduction of unsworn, out of court statements and opinions of investigators as to the veracity of witnesses is patent error, and the failure to object in this case is ineffective assistance of counsel sufficient for this court to vacate the conviction. the right to confrontation is fundamental and cannot be harmless error in this case when the de facto waiver occurs because of ineffective counsel.

A.    Unsworn out of court statements by the alleged victim whose interview included coaching by law enforcement for an extensive period, including correcting her various statement so her story was consistent with other witnesses.

B.    Investigators poured unsworn hearsay into the record, denying Cross Examination without objection from the defense, vouching for the victim and assessing that she was afraid of her father so she was "threatened".

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record.  After reviewing the record, we find no errors patent.

**ASSIGNMENT OF ERROR ONE:**

In Defendant's first assignment of error, he argues there was insufficient evidence to prove the elements of second degree rape, as there was no evidence of threats or use of force, and fear is not an element of the offense of second degree rape.  Additionally, Defendant argues his trial counsel did not object to an erroneous jury instruction that left out La.R.S. 14:43(A)(4), which explained that third degree rape is "without consent."  Before setting forth Defendant's specific arguments, we will set forth the testimony from trial.

**Evidence At Trial:**

At trial, the State called Officer Herman Peterson. Officer Peterson testified he has been employed with the Opelousas Police Department since 2015, and works as a k-9 officer, DARE officer, patrol officer, and in other roles. Officer Peterson indicated that as a DARE officer, he visits schools and teaches courses to assist students. Officer Peterson said he knew C.B. because she was in the junior high program, but he never worked with C.B. when she attended high school. Officer Peterson testified that in April of 2020, he received a phone call from C.B., and on this call, C.B. was crying and started to explain what happened, but he informed her to call the police department. Officer Peterson said at the time based on the phone call, he believed C.B. was calling in reference to a rape. Officer Peterson testified C.B. was afraid, and she did not think people would believe her.

On cross-examination, Officer Peterson said he recalled C.B. telling him that her father had done things to her. Officer Peterson stated he did not have much interaction with C.B. aside from the phone call, and once C.B. called the police department, Officer Peterson was done with the case.

The State then called Yolanda Lewis. Officer Lewis stated that she is a patrol officer for the Opelousas Police Department. Officer Lewis said she was dispatched to a residence in response to a sexual assault allegation. Officer Lewis testified she encountered C.B. who came out of the residence, and C.B. was very upset and crying. Officer Lewis testified that C.B. said she was sexually assaulted by Defendant on a previous day. Officer Lewis said C.B. told her that C.B went to Defendant's residence "to print some insurance cards, and [Defendant] began to assault her, and took her to . . . guide[d] her to the front living room of his residence, and began to pull her pants down and also her panties down, and played with her

4

vagina." Officer Lewis testified she asked C.B. about the clothing C.B. was wearing when the rape took place, and C.B. retrieved those clothes from the residence, which Officer Lewis then collected. Officer Lewis testified that she bagged the hoodie and blue jeans, and she brought the evidence to the police station.

Officer Lewis said C.B. told her the rape happened at Defendant's home. Officer Lewis said C.B. also told her that C.B. had contact with Defendant after the rape when she brought Defendant to an eye appointment. C.B. recorded Defendant by cell phone "because she advised no one was gonna believe her in reference to her complaint." Officer Lewis testified she did not recall collecting Defendant's underwear, and she said she passed the case off the Sergeant Ebony Martin.

Next, the State called Sergeant Ebony Martin to the stand. Sergeant Martin testified that she is employed with the Opelousas City Police as a patrol sergeant. However, she was previously employed as a detective, including during the time frame of April 27, 2020, through April 29, 2020. Sergeant Martin said she was assigned to a potential rape case and was informed by Officer Lewis that Lewis made contact with C.B. Sergeant Martin stated she advised Officer Lewis to bring C.B. in for an interview, and Sergeant Martin conducted the interview on April 29, 2020. Sergeant Martin testified that after conducting the interview she was able to determine the alleged rape took place on April 27, 2020. Sergeant Martin stated she spoke with C.B. who explained that she went to buy a car on April 27, 2020, and she and Defendant went together because Defendant would help pay for it. C.B. and Defendant returned to Defendant's residence to get insurance cards. At the residence, the two discussed errands to do the next day, but "at some point in the conversation, he grabbed her by the hand and brought her over to the sofa, and pulled her pants and panties down, and then set her on his lap, and they had intercourse."

5

Sergeant Martin said C.B. told her that as Defendant was taking C.B. and pulling her over, C.B. "didn't want to . . . but she was fearful to resist his advances, because it's her dad[.]" Sergeant Martin acknowledged that the interview was recorded, and the State submitted the video into evidence.

The video interview was played, but as it was difficult to hear, Sergeant Martin explained what was occurring in the clips. In the first video clip, Sergeant Martin explained that she was gathering background and personal information from C.B. Sergeant Martin said in the second clip, C.B. explained that Defendant is involved in a swinger's club and wanted her to get into the club. Sergeant Martin testified that C.B. was recounting how Defendant wanted the two of them to enter the club together as a couple. Sergeant Martin testified C.B. told her Defendant wanted to know her sexual abilities. Sergeant Martin confirmed C.B said that Defendant grabbed her near the stove. Sergeant Martin stated that, from the investigation, they determined the rape happened in the living room of Defendant's residence. Sergeant Martin confirmed Defendant started in the kitchen but moved C.B. to the living room after Defendant had said he wanted to see "what the team is working with."

A portion of the video interview of C.B. was played during which C.B. made a statement that Defendant had killed her brother. Defense counsel objected and a hearing ensued outside of the presence of the jury. Following the court's ruling on the objection, the State returned to questioning Sergeant Martin. Sergeant Martin confirmed she arrested Defendant for second degree rape. Sergeant Martin testified C.B. never said she agreed to have sex with Defendant, and Sergeant Martin was under the impression Defendant instituted the sexual activity. Sergeant Martin confirmed she wanted to talk to C.B.'s boyfriend, Doncravon Terry, because C.B.

6

had mentioned him. Sergeant Martin stated Terry said C.B. told him Defendant pulled her pants down and fondled her but did not mention intercourse. Upon speaking with C.B. again, Sergeant Martin testified that C.B. told her she could not tell her boyfriend the full story because she was afraid of how he would feel about her. Sergeant Martin confirmed C.B. said she visited Defendant the next day in an attempt to get proof of what happened. Sergeant Martin stated once C.B. had recorded her father, C.B. was finished and had instructed her boyfriend to continue to call her cell phone to make it seem like she had to leave. Sergeant Martin said C.B. was afraid of how her boyfriend would look at her.

Sergeant Martin testified she was provided a copy of the recording from C.B. Sergeant Martin indicated that, in her opinion, the recording confirmed what C.B. said took place. Sergeant Martin said she picked up Defendant the next day and brought him in for questioning. Sergeant Martin indicated she gave Defendant his *Miranda* rights, and he agreed to talk. Sergeant Martin stated Defendant told her nothing happened, and when she asked if he had sexual intercourse with C.B., Defendant said, "No." Sergeant Martin said Defendant was there for hours, and he continually said nothing ever happened, but Sergeant Martin explained that she did not believe him. Sergeant Martin testified that she played the recording from C.B. for him, and "he just started explaining, talking, rambling on about the sex club, and still saying that he never had sex with her[.]" Sergeant Martin said Defendant admitted he belonged to a swinger's sex club and admitted to attempting to convince his daughter to become affiliated with the club. Sergeant Martin testified Defendant confirmed that he wanted C.B. to go in the club as his submissive, but Defendant said it was cheaper to go in as a team. Sergeant Martin also confirmed Defendant said he wanted C.B. to convince the other members that the two of them were a

7

couple, but he denied he was planning to have sex with her. Sergeant Martin stated she confronted Defendant with the audio recording of he and C.B. talking about penetration, but Defendant denied that it was him on the audio.

On cross-examination, Sergeant Martin said C.B. did not tell her that Defendant threatened her, used force, or that C.B. resisted. Sergeant Martin confirmed C.B. was with Defendant so he could help C.B. purchase a vehicle. Sergeant Martin reaffirmed what C.B. told her, that Defendant started talking about the swinger's club, grabbed her, pulled her towards him, pulled her pants down, placed her on top of him, and penetrated her. After the defense played C.B.'s interview, Sergeant Martin stated she remembered C.B. saying, "To me, it wasn't rape, because I could have done better stopping him. I was in a daze. I didn't want him to take my car." Sergeant Martin testified she did not order a rape kit because too much time had passed. Sergeant Martin confirmed she initially thought C.B. seeing her father the next day was strange until C.B. explained her reason for doing so.

On redirect examination, Sergeant Martin again confirmed no threats were made towards C.B. Sergeant Martin stated she believed the force element was satisfied because C.B. was led by Defendant, and in C.B.'s mind, "because of fear, she felt like . . . and that was her father . . . she had to do what he was telling her, what he was leading her to do, and that's why I felt like it was force."

The State then called Doncravon Terry to the stand. Terry said he was dating C.B. on April 27, 2020, and he knew she bought a car with her father's help. Terry indicated that he and C.B. were living together at his mother's house. Terry said when he saw C.B. return from her father's house, he felt like something was wrong with her. Terry testified C.B. seemed depressed, down, and felt bad. Terry stated

he knew C.B. would visit her father the next day to get proof so people would believe her. Terry said C.B. came back with proof, and he listened to the video. Terry stated he did not collude with C.B. to make up allegations against Defendant.

On cross-examination, the defense played Terry's interview with the investigators. Terry confirmed that at first, he did not believe C.B. Terry further confirmed that when C.B. came home after the incident, the two of them washed the car together, went by a relative's house, and played a video game. Terry stated he did not believe her until she played the video.

The State then called Bethany Harris, who confirmed she is employed with the Acadiana Crime Lab as a DNA analyst. Harris was accepted as an expert in the field of DNA analysis by the court. Harris confirmed that her team received reference samples from Defendant and C.B. along with articles of clothing belonging to C.B. As to C.B.'s underwear, Harris confirmed she found a mixed DNA profile with more than one contributor, but she found Defendant to be excluded from the profile. As to C.B.'s jeans, Harris stated Defendant could not be excluded as a contributor from the swabs of the waistband and the crotch. As to the sweatshirt, Harris stated nothing was collected from it.

The State then re-called Sergeant Ebony Martin. Sergeant Martin again confirmed that she interviewed Defendant. The State then introduced the interview with Defendant. Sergeant Martin confirmed that throughout the interview Defendant's body language would change and Defendant's voice would go lower, but Sergeant Martin stated Defendant never admitted to having sex with C.B.

On cross-examination, Sergeant Martin stated she interviewed Defendant for four hours because Defendant kept denying doing anything, but she had a recording that said otherwise.

9

The State then called C.B. to the stand. C.B. said in April of 2020, she reached out to Officer Peterson and gave him a briefing of what had happened to her. C.B. said she reported the incident to other officers who then came out and brought her in for an interview. C.B. said Defendant is her biological father, and as an adult, she would go and visit her father. C.B. said she helped Defendant with his mail, cooking, and cleaning. C.B. explained that she bought a car with Defendant's help, but she had to get the insurance cards printed from Defendant's house. The State then played portions of C.B.'s interview with police, and C.B. confirmed that, on the day of the offense, she was initially standing in the kitchen by the stove. C.B. said she was in the kitchen when Defendant stood behind her and said, "You know, we're a team," and asked C.B. to "[s]how [him] what the team is working with." C.B. recounted Defendant pulling down her pants, and she told him, "It's starting to feel like rape again."

C.B. testified that she used to dance, so Defendant told her about this club with "dom[s]" and "sub[s,]" and she thought Defendant would bring her there and introduce her to people. C.B. said that after Defendant pulled down her pants, he told her it was not rape because she was grown, and he started talking about the swinger's club again. C.B. confirmed she felt like she would have been in physical danger had she resisted him. C.B. said she did not have enough space to run out of the house because Defendant was standing right behind her, and "[h]e was a father you didn't question." She further testified, "I felt like if I would have said no and stuff, I would have been like punished or something . . . punished as an adult." C.B. said during the incident she blanked out and just wanted it to be over with. C.B. stated Defendant insisted she leave her underwear behind, and he wanted her to clean herself before leaving. C.B. said she visited Defendant the next day because she

needed to get proof that the offense happened to her. C.B. explained that she set her phone to record underneath the car seat, and that Defendant talked freely about it during the car ride. C.B. confirmed she gave this recording to the police, and the State played the recording for the jury. C.B. further confirmed that the two voices belonged to herself and Defendant. C.B. stated she did not want to have sex with Defendant, that she had sex against her will, and that she was fearful she would be injured if she did not agree.

On cross-examination, C.B. said she used her stimulus money to help pay for the vehicle, and Defendant helped by providing some of the remaining balance. C.B. said she recalled telling the officers that Defendant started hugging on her while she was looking through his mail, but it did not make her uncomfortable because Defendant hugged. C.B. said Defendant started saying they were a team, and he started to pull her pants down. C.B. admitted she was incorrect in her statement to the police when she told them her underwear had snaps on the side, but C.B. said she had too much on her mind. C.B. said both her pants and underwear were pulled down to her ankles. Then, Defendant turned her around, said it was not rape, talked about them being one, and pulled her to the living room. C.B. said Defendant grabbed her with enough force to pull her because she did not want to go, and she told him it felt like rape. C.B. stated she never told him to stop because it would not have helped. C.B. said Defendant took her to the living room, sat down on the sofa, turned her around, and "that's when the sexual act starts."

C.B. admitted she did not resist, and Defendant did not threaten her. C.B. said she did not go to the doctor after because she did not trust anyone at the time.

On re-direct examination, C.B. said she did not manipulate Defendant into saying anything on the recording. C.B. stated she did not want to go with Defendant

11

into the living room, but Defendant brought her there against her will. C.B. reiterated that it felt like rape.

The defense then called Defendant to the stand. Defendant testified that he did not rape his daughter because the sexual act was consensual. Defendant said everything started over a tattoo where C.B. said the tattoo was in honor of him. Although C.B.'s biological father, Defendant testified he did not meet her until she was ten years old. He testified that about a year later, he was questioned by police because C.B. claimed he molested her in front of her grandmother. Defendant said he did not force C.B. to have sex with him, did not intimidate her, and did not threaten her in any way.

On cross-examination, Defendant admitted it was his voice on the recording with his daughter. Defendant admitted he told C.B., "I'm not gonna pursue you anymore. From now on you gotta pursue." On cross-examination the prosecutor stated, "I understand that you're telling this Court that the way that you make somebody have a orgasm, regardless of whether the person wants to have a[n] orgasm or not, even when they say . . . [']stop' you keep going anyway." Defendant answered, "Well, yes, I keep going to get a[n] orgasm, to see if they get a[n] orgasm, that's right."

On re-direct examination, Defendant said he was talking about a "restraint type thing" and how most say they were glad he did not stop. Defendant admitted he lived an alternative lifestyle.

Several videos were played for the jury. State's Exhibit 12 was a recording of C.B. and Defendant talking. At two minutes and forty-three seconds, C.B. can be heard asking why she has to call him sir, in regards to the swinger's club, and Defendant responds "that's subs" and told her to read up on subs. "That's the label,

12

you in with the group.  The mistress is the one controlling."  Defendant said he is a "dom."  Defendant continued talking about the swinger's club and the various lingo used.  Defendant said he has not found his "sub."  At six minutes and twenty-three seconds, Defendant said, "I don't care if you marry this little dude, every time you're gonna sleep with him, you gonna think about me. . . . I seen you cum, frontwards, . . . my dick was white, looked like milk was on that motherfucker."[2]  Defendant continued talking in this manner and said, "But I wanted it the other way. . . . that's when you did . . . and I said am I hurting ya . . . and you said nah.  If it feels good keep moving, that's the key to it.  Don't stop."  C.B. can be heard responding, "It just revert right back to that's your dad."  Defendant said, "From the time at the stove to the time on the sofa, didn't your mentality change.  Did your mood and everything?" Defendant also said, "You were trying to avoid that while I was telling you that would change the mood, that would change the mindset. . . . If you don't allow this, how will you know?"  Defendant further said, "From the time you were at the stove to the time you got to the bathroom, it was a whole total different person. You went through it. . . .  It wasn't a disappointment.  It was enjoyment."  C.B. mumbled.  At eight minutes and nineteen seconds, Defendant said they integrated their bodies and became as one.  Defendant said there would be no more pursuit from him because he cannot pursue her as a "dom."  Defendant said she had to be subservient and touch on him because he cannot do it.

In the video marked State's Exhibit 1, C.B. is observed sitting in the interview room as Sergeant Martin enters.  C.B. said she and Defendant purchased a car a few

---

[2] We have quoted from the evidence exactly, despite the vulgarity and lewdness.

days ago, and Defendant offered to pay some of the price. C.B. said Defendant told her to meet at his house so he could print the insurance cards.

C.B. went to Defendant's house for the insurance cards and while there she started talking with him. She said Defendant mentioned a swinger's club where he wanted her to go as his sub. C.B. said Defendant said to show him what the team is working with, and C.B. froze by the stove. C.B said he pulled her pants down and said, "I got to see what you're working with." C.B said after he pulled down her pants, she said it felt like she was getting raped. C.B. said Defendant told her this isn't rape because they were a team, and their bodies were connected. C.B. said she froze because this was the same place he killed her brother, and she did not want to be killed for saying no. Defendant took her to the living room and told her to be still, calm down, do not move, and get comfortable. C.B. said she could not get comfortable. That's when he put his penis inside of her. C.B. said she told him she wanted to stop, and Defendant replied he was going to start from the basics so she knew what to do at the club. C.B. stated that Defendant said they could not know she was his daughter. C.B. said they started and finished, and she said she had to go home, and Defendant didn't want DK, her boyfriend, to know. C.B. said Defendant let her clean off and Defendant took her underwear. Defendant told her to come back that night. C.B. said she texted him said she could not make it tonight.

C.B. explained that the next day she had to pick Defendant up for his eye surgery and that's when she started the audio recording. She wanted to get him on the recording because she did not have any proof. C.B. said her pants were down and she tried to stop him the first time, but Defendant yanked her by the hand and Defendant sat down in the living room and told her not to move. Defendant told her not to move because she would get used to it.

14

There was also a recording of Defendant that lasted approximately four hours, according to Sergeant Martin. However, Sergeant Martin testified Defendant denied having sex with C.B. During trial, the parties acknowledged the video was hard to hear, so the entire video was not played.

**Merits Of Assignment Of Error One:**

In brief, Defendant makes two arguments in Assignment of Error One. First, Defendant argues there was no evidence of threats or use of force; thus, there was insufficient evidence to prove the elements of second degree rape. In support of this arguments, Defendant asserts that "fear" is not an element of second degree rape and then notes that on cross-examination, Sergeant Martin stated Defendant did not threaten or use force against C.B. and that C.B. did not resist.

Defendant argues that whether C.B. had a conscious fear of Defendant is immaterial and provides no help to the State in meeting its burden of proof for second degree rape. Defendant argues that whether C.B. might have been afraid is not included as an element of the offense and such a conclusion is not based on credible evidence. Defendant notes the statute does not reference regret, anxiety, or trauma for second degree rape. Defendant argues the lack of the critical element of threats or force is irreconcilable with a guilty verdict.

Additionally, Defendant argues that his trial counsel did not object to an improper jury instruction which left out a responsive verdict, particularly La.R.S. 14:43(A)(4), third degree rape, or rape "without consent." Defendant argues third degree rape should have been weighed as a responsive verdict in this case, but "[t]he [S]tate chose instead to create a concept of the internal thoughts of the victim through witnesses who were not present and whose impressions were inadmissible." Defendant claims the trial court failed to properly explain the elements of third

15

degree rape under La.R.S. 14:43 because subsection (4) was never presented to the jury. Defendant argues this error is fatal and cannot be harmless, as there is a reasonable probability the erroneous jury charge contributed to his conviction, and cites *State v. Revish*, 15-470, 15-471 (La.App. 1 Cir. 11/9/15), 185 So.3d 8, *writ denied*, 15-2247 (La. 5/20/16), 191 So.3d 1066, in support.

In opposition, the State asserts it sufficiently proved every element of second degree rape beyond a reasonable doubt, and that the trial court's inadvertent admission of subsection four of the lesser included offense of third degree rape was harmless error and did not prejudice Defendant. First, the State argues that the element of vaginal sexual intercourse without C.B.'s consent was proven by C.B.'s testimony, Defendant's testimony, the secretly recorded statement, the DNA analysis, and the very nature of the father-daughter relationship. Second, the State argues it proved the rape was committed under circumstances where C.B. was prevented from resisting the act by force or threats of physical violence where C.B. reasonably believed such resistance would not prevent the rape. The State notes that C.B. testified that Defendant grabbed her from behind, pulled down her pants and underwear without consent, yanked and pulled her to the living room by force and against her will, with her pants and underwear around her ankles, with C.B. telling Defendant that it felt like rape. The State further notes that in the recorded audio, Defendant even mentioned how C.B. tried to resist, and C.B. testified she was afraid, had nowhere to run, and did not think resisting would have helped. The State argues the jury properly found the State proved every element of second degree rape beyond a reasonable doubt.

As to the jury instruction, the State claims the error was harmless, and the appropriate standard for determining harmless error is whether the guilty verdict was

surely unattributable to the jury charge error. *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078 (1993). The State claims neither Defendant nor his trial counsel argued Defendant simply acted without the consent of C.B.; rather, the defense argued the exact opposite—that the sexual intercourse was consensual. "So, for [Defendant] to now argue that but for the omission of part (4) in the jury instruction, he would have instead been convicted of third degree rape is ludicrous." The State asserts that, the jury found the State proved every element; thus, any error in the jury instruction is harmless.

In *State v. Hearold*, 603 So.2d 731, 734 (La.1992), the supreme court held:

> When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana,* 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.

> On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

Defendant combines his insufficiency claim with arguments regarding the allegedly improper jury instruction. Considering the above, we will first review the

sufficiency of the evidence then address Defendant's argument concerning the responsive verdict/jury instruction.

The general analysis for insufficiency of the evidence claims is well-established:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant was charged with second degree rape, in violation of La.R.S. 14:42.1. Second degree rape is defined in pertinent part as:

> [R]ape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

La.R.S. 14:42.1(A).

As indicated above, the defense is challenging whether the State proved beyond a reasonable doubt that C.B. was prevented from resisting by force or threats of physical violence. In assessing this argument, we look to this court's lengthy

18

opinion in *State v. Carter*, 14-926, pp. 3-17 (La.App. 3 Cir. 4/1/15), 160 So.3d 647, 649-57, *writ denied*, 15-859 (La. 6/17/16), 192 So.3d 770:

On appeal, Defendant argues that the evidence was insufficient to convict him of attempted aggravated rape. Although the State presented no physical evidence, several witnesses testified. We summarize the pertinent testimony below.

### *Testimony of B.P.*

At trial, B.P. testified that Defendant had sexual encounters with her beginning when she was six or seven years old and continuing until she was in her teens. The victim testified that she was contacted by a relative in reference to an investigation of Defendant, which motivated her to come forward about the incidents.

The victim alleged that, on two occasions, when she was six or seven years old, Defendant came into the room where she was napping and put his penis between her legs, without penetration. She testified that other children were present in the room when these incidents occurred. The victim also testified that, when she was approximately seven years old and had spent the night at Defendant's house with Defendant's daughter, Pamela Davis (hereafter "Ms. Davis"), who is B.P.'s cousin, Defendant carried B.P into the bathroom and had sex with her. Again, she testified that at least one other child was present in the room. B.P. recalled this being the first time Defendant penetrated her, although she had some difficulty recalling the chronology of events. She further testified that, when she was eight or nine years old, Defendant had sex with her in the bed of her father's produce truck. She testified that there were adults and children in the house nearby. She explained that Ms. Davis knew of the incident in the bed of the truck and that Ms. Davis was about five years old.

The victim further alleged that, on two occasions, Defendant offered to give her driving lessons. Thereafter, Defendant took her driving, and Ms. Davis was in the back seat. On the first occasion, he pulled to the side of the road, alleging he needed to adjust the seat, pulled his penis out of his pants, and then had her sit on his lap to drive. B.P. testified that there was no penetration because she was wearing her panties and skirt. On the second occasion, when Defendant pulled over and adjusted the seat, the victim realized what was happening and refused to sit on Defendant's lap.

B.P. testified that, on several occasions, she reported the abuse to her mother, who is Defendant's sister, but that "[t]elling [her] mom wasn't enough. It wasn't getting anywhere." B.P. never reported the abuse to her father because "[she] was scared of [her] dad." B.P. explained that, after the second driving incident, she purchased a

recording device and recorded Defendant confessing to the things he had done to her. She played the recording for her mother, who then called a meeting, during which this recording was played. Present at the meeting were Defendant, Defendant's wife, B.P., Ms. Davis, and B.P.'s mother. B.P. testified that Defendant's wife identified him in the recording. A second meeting was called with the pastor of their church; the pastor's wife, who was Defendant's sister; Defendant, who was a deacon at the church; Defendant's wife; B.P.; and B.P.'s mother. B.P. testified that, at the second meeting, Defendant admitted the allegations, and it was decided that Defendant would stop all sexual activities with the victim. In exchange, the victim would not tell anyone of the offenses. The recording was not presented as evidence.

### *Testimony of Pamela Davis*

Ms. Davis testified that she is three years younger than B.P. Ms. Davis testified that Defendant would "quite often" give her pornographic magazines with pictures circled in them to bring to the victim. Ms. Davis testified that B.P. had gone to get a watermelon out of her father's truck, Defendant went with her, and they were taking a long time. She thought Defendant must be waiting for her in the car. When she did not see Defendant in the car, she checked the garage. There, she witnessed Defendant and the victim in the bed of the produce truck, and it appeared to her that they were having intercourse, although she did not actually see Defendant's penis and his clothes were not off. Ms. Davis testified that she recalled being eight or nine years old and "[she] wasn't five." Ms. Davis further testified that the incident occurred in 1975 or 1976.

Ms. Davis recalled one driving incident. Ms. Davis testified that she, Defendant, and B.P. were in the front seat of the car. When they arrived in the area where B.P. would be driving, they stopped, and Defendant instructed her to get in the back seat. Ms. Davis testified that she was usually allowed to sit in the front seat with Defendant and B.P., but that on this occasion, she was directed to sit in the back seat, so the incident "stood out for [her.]" She testified that B.P. was sitting on Defendant's lap and drove for "a while." She testified that she did not see anything sexual.

Ms. Davis recalled being present at the meeting where the allegations against Defendant were discussed with Defendant, Defendant's wife, B.P., and B.P.'s mother. She recalled her mother, Defendant's wife, identifying Defendant as the person who had been recorded.

### *Discussion*

Defendant argues that the evidence was insufficient to convict him of attempted aggravated rape. In brief, Defendant notes the lengthy

span of time that elapsed between the alleged misconduct and the victim's testimony, the inaction by B.P.'s mother, the fact that others were nearby when the misconduct occurred, and the "unbelievable" testimony concerning the "secret pact." He further asserts that the physical evidence contradicts the testimony of the victim, although his argument focuses on the absence of physical evidence. Essentially, Defendant argues that the victim's testimony lacks credibility.

. . . .

## Responsive Verdicts

An appellate court may modify the verdict instead of granting a judgment of acquittal. La.Code Crim.P. art. 821(E). "If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court . . . may modify the verdict and render a judgment of conviction on the lesser included responsive offense." *Id.* In fact, "the discharge of the defendant is neither necessary [n]or proper when the evidence does support a conviction on a lesser and included offense which was a legislatively authorized responsive verdict." *State v. Byrd,* 385 So.2d 248, 251 (La.1980). We find the evidence adduced at trial does support a conviction for the lesser included offense of forcible rape. We therefore modify the verdict and enter a judgment of conviction of forcible rape. We vacate the sentence and remand the case to the trial court for sentencing for forcible rape.

. . . .

To sustain a conviction for forcible rape, actual resistance is not required. *State v. Savario,* 97–2614 (La.App. 1 Cir. 11/6/98), 721 So.2d 1084, *writ denied,* 98–3032 (La.4/1/99), 741 So.2d 1280. Rather, all that is necessary is that the victim be *prevented from* resisting by force or threats of physical harm to such an extent that she *reasonably believed* resistance to be futile. La.R.S. 14:43.1, 1975 La. Acts No. 333, § 1; *Savario,* 721 So.2d 1084. Only a subjective, reasonable belief is necessary. *See Savario,* 721 So.2d 1084; *See also State v. Powell,* 438 So.2d 1306, 1308 (La.App. 3rd Cir.), *writ denied,* 443 So.2d 585 (La.1983) (Stoker, J., dissenting); *State v. Probst,* 623 So.2d 79 (La.App. 1 Cir.), *writ denied,* 629 So.2d 1167 (La.1993); *State v. Burger,* 531 So.2d 1163 (La.App. 4 Cir.1988), *determination sustained,* 541 So.2d 842 (La.1989).

In *Powell,* 438 So.2d 1306, a minor victim asked the defendant for a ride and he agreed to take her to a cousin's house. Instead, he brought her to a secluded area. The victim testified that the defendant slapped her, threatened to kill her, and indicated a weapon was under the seat of the vehicle. She removed her own pants, and he had sexual intercourse with her. A panel of this court concluded there was no

evidence of resistance and little evidence that she believed resistance to be futile. In a strongly worded dissent, Judge Stoker explained:

> The victim in this case stated that she submitted because the defendant threatened to kill her if she did not. Although she did not state in so many words that she did not resist because she believed that resistance would not prevent the rape, that is the clear meaning of her testimony. If that meaning is not given to her testimony, it is tantamount to requiring a person threatened with rape to either be faced with a dangerous weapon or to resist to the utmost and, in either case, subject themselves to the possibility of great physical harm or death. This is resistance in the context of aggravated rape. Forcible rape requires less.

*Id.* at 1309–10.

In *State v. Wilkinson,* 00–339, p. 15 (La.App. 5 Cir. 10/18/00), 772 So.2d 758, 766, *writ denied,* 00–3161 (La.10/12/01), 799 So.2d 494, the fifth circuit explained that evidence presented by the state was sufficient to convict the defendant of forcible rape where the defendant:

> forcibly grabbed [the victim], threw her to the ground, pushed down her clothing, laid on top of her and penetrated her vaginally several times. [The victim], a fourteen-year-old, was frightened, weighted down by the backpack and did not know whether any action on her part would have caused him to do additional harm. She was thrown into a secluded area and could have reasonably believed that screaming would be futile.

In *Wilkinson,* the defendant did not threaten the victim and did not have a weapon.

Our own circuit has upheld a conviction for forcible rape under similar circumstances. In *State v. Schexnaider,* 03–144, p. 4 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 454, the minor victim testified that she and the defendant were sitting on the tailgate of the defendant's truck when he "grabbed her face, kissed her and pushed her onto her back in the bed of his pick-up truck." The defendant then "g[o]t on top of her", took off her pants, and penetrated her. *Id.* She testified that the defendant did not slap her and she did not resist, but that "when she get[s] frightened, she freezes." *Id.* Eventually, "she was finally able to tell the defendant 'No,' " and that she was going to tell someone, and the defendant stopped. *Id.* Again, there was no indication that the defendant threatened the victim or had a weapon. A panel of this court upheld the conviction for forcible rape and specifically endorsed the dissent in *Powell.*

B.P. described several incidents that occurred prior to the events that serve as the basis for conviction of Defendant. She recalled the first incident to have occurred when Defendant came into the room while she was napping. . . .

. . . .

B.P. testified that, between the ages of six and nine, Defendant "did a lot of fondling." She explained a plan she had made with Ms. Davis to avoid having sexual contact with Defendant[.]

. . . .

B.P. also described an incident that occurred when she was approximately seven years old when she was spending the night with Ms. Davis at Defendant's house. . . .

. . . .

In her testimony, the victim further indicated that, although the she was able to "just jump[ ] up" after Defendant penetrated her vaginally, she was scared, hysterical, and "didn't know [what] was going to happen."

The parallels between *Wilkinson, Schexnaider,* and the instant matter are striking and support a finding of forcible rape. In *Schexnaider,* 852 So.2d at 454, 457, the defendant "pushed her onto her back in the bed of his pick-up truck" and "got on top of her." In *Wilkinson,* 772 So.2d at 766, the defendant "pushed down [the victim's] clothing [and] laid on top of her" after he grabbed her and threw her to the ground. In the instant matter, although the victim testified that Defendant "said, lay down," she also testified "[she] didn't know [intercourse] was going to happen[ ]" and that Defendant "made" her lie down in the bed of the truck. Then, he pushed her panties to the side; she did not willingly remove them. Then, he "got on top of [her]" and had sex with her. Additionally, B.P. indicated she was scared, confused, and upset. She "jumped up" when it began to hurt. In slightly different words, the victims in *Schexnaider, Wilkinson,* and the instant matter said the same thing; an adult man made them get on their back, got on top of them, and penetrated them vaginally. Although B.P. did not explicitly say that she did not resist because she believed that resistance would be futile, it is clear from B.P's testimony that when Defendant "made [her] lay down," "pushed" her panties to the side, and "got on top of [her,]" she believed it pointless to resist. Consideration of the victim's age and size supports this conclusion. B.P. was a young girl of barely twelve years old; Defendant was an adult man. Although B.P. did not directly testify to the size difference between the two, she explained that, at one point, Defendant was large enough to physically

23

pick her up and carry her to his bathroom, where he got on top of her and had sex with her. The conclusion that B.P. thought it futile to resist is further buttressed by the history of Defendant having taken advantage of her on numerous prior occasions and her having been helpless to dissuade him on any of the prior occasions. B.P. testified that, on at least one occasion, "[Defendant] woke [her] up by shaking [her]" and "he put his hands over [her] mouth." She described how "[she] was always trying to make him stop." She explained a plan she and Ms. Davis had concocted so "he [would not] get to [her]." However, the plan proved unsuccessful, as B.P. testified that Defendant, nonetheless, "got [her] out of bed, and carried [her] into his bathroom," where he penetrated her. A jury could reasonably have concluded that the victim reasonably believed that, against the force Defendant exerted with his body as he "got on top" of B.P., resistance was useless, especially in light of her age, her size, and the extensive history between the two. Accordingly, we modify the verdict and render a judgment of conviction on the lesser included offense of forcible rape and remand for resentencing in accordance with that judgment.

In *State v. Thibeaux*, 17-293, pp. 24-32 (La.App. 3 Cir. 10/11/17), 229 So.3d 967, 983–87, *writ denied*, 17-1914 (La. 2/25/19), 266 So.3d 287, *and writ denied*, 17-1909 (La. 2/25/19), 266 So.3d 288, this court held:

Considering the evidence introduced at trial herein as to the present victim's resistance and the force used to overcome it in relation to the resistance and force recited in the cases above, we find the evidence was insufficient for any rational factfinder to find that the element of aggravated rape at issue—H.A. resisted to the utmost but her resistance was overcome with force—had been proven beyond a reasonable doubt. In each of the cases in which the courts found that the element of utmost resistance overcome by force was satisfied, the State presented evidence that the victim resisted by crying, screaming, trying to run away, or squirming, or that her attempts to do so were met with threats or physical violence in the form of the defendant throwing, grabbing, dragging, punching, or striking the victim.

The evidence herein shows that as to count one, the first anal rape, H.A. said that she resisted, but Mr. Thibeaux held her down. As to count two, the first vaginal rape, H.A. testified that Mr. Thibeaux would try to whip her and that she would make noises. She also said that she resisted by moving her legs, but Mr. Thibeaux would hold them down. Regarding the third count, we find the only specific evidence of resistance was the fact that H.A. described the rape in response to the State's question, "Was there any other time where he had sex with you and you resisted him?" H.A. testified, however, that she did not scream, yell, or kick Mr. Thibeaux during any of the assaults. There was no testimony that H.A. tried to get away and was prevented by either

24

threats of harm or force from Mr. Thibeaux.  The only threat spoken of was her ability to see her boyfriend.  And though the movement of her legs was met by Mr. Thibeaux holding her down or trying to "whip" her, this force is not to the degree of or in proportion to the force exerted in the jurisprudence discussed above.  Thus, although there was evidence of resistance as to each count, we do not find that any rational factfinder could have found that this evidence, even when viewed in a light most favorable to the prosecution, proves beyond a reasonable doubt that H.A. resisted the acts to the utmost but that her resistance was overcome by force so to warrant the greater degree of punishment imposed for aggravated rape.

Because we find the State did not prove beyond a reasonable doubt that Mr. Thibeaux committed the offense of aggravated rape, we will now consider whether a lesser included responsive offense was proven.

. . . .

As recited and noted above, the evidence presented by the State through H.A.'s testimony, her Hearts of Hope interview, and the report of her sexual assault examination does support a finding that she resisted in each of the sexual assaults for which Mr. Thibeaux was convicted of aggravated rape.  In both counts one and two, H.A. testified that she did resist but her resistance was thwarted by Mr. Thibeaux holding her down or attempting to "whip" her.  Moreover, the jury was able to compare the sizes of both H.A. and Mr. Thibeaux and take the difference in their sizes into consideration.  Also of relevancy was the fact that H.A. was only thirteen and fourteen at the time of the rapes and Mr. Thibeaux was an adult man.  Additionally, Mr. Thibeaux was in a position of authority over H.A., which may have affected her belief that further resistance would be useless.

Taken with the history of abuse H.A. testified to at trial and in her interview and her fear that "he could do something else like abuse[,]" which prompted her to not "do anything[,]" the jury could have concluded that H.A. reasonably believed that further resistance was useless.  Therefore, we find the evidence was sufficient to prove forcible rape as to counts one and two.  But as to the third count, while H.A. did recount the vaginal rape that occurred when she was home alone with Mr. Thibeaux in response to the State's question about whether there was any other time she resisted, the State did not present any evidence or details regarding either (1) the force employed by Mr. Thibeaux, or (2) H.A.'s belief that resistance would be futile in that instance.  An inference that the same amount of force was exerted as in count one just because H.A. testified to count three directly following her testimony as to count one is simply not sufficient to prove the elements of forcible rape.

25

However, as Mr. Thibeaux concedes, the evidence was sufficient to prove sexual battery pursuant to La.R.S. 14:43.1(A)[.]

. . . .

All the elements necessary to prove the offense of sexual battery were clearly met in this case as to count three given that H.A. testified that Mr. Thibeaux penetrated her vagina with his penis without her consent when she was under the age of fifteen and more than three years younger than Mr. Thibeaux. Accordingly, we modify the verdict and render a judgment of conviction on the lesser included offense of forcible rape for counts one and two and on the lesser included offense of sexual battery for count three. We further remand for resentencing in accordance with that judgment.

For another discussion on the use of force as well as credibility determinations, we look to *State v. Dufrene*, 20-290 (La.App. 5 Cir. 12/9/20), 307 So.3d 1182.[3] In *Dufrene*, the fifth circuit held:

As to evidence relating to the defendant's use of force on the victim, both the victim and Mr. Van Norman testified to the defendant pushing the victim's upper body twice. Defendant testified that he did not touch the victim. The trial judge considered the testimony of the witnesses and any inconsistencies therein and found the State's witnesses to be more credible than the defendant. When there is conflicting testimony about factual matters, the resolution of which depends on a determination of the credibility of witnesses, this is a matter of the weight of the evidence, not its sufficiency. *State v. White*, 472 So.2d 130, 132 (La. App. 5 Cir. 1985). The credibility of witnesses is within the sound discretion of the trier of fact who is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. The reviewing court is not "to second guess the rational credibility determinations of the fact finder at trial." *State v. Juluke*, 98-341 (La. 1/8/99), 725 So.2d 1291, 1293. In this case, where Mr. Francisco, an impartial witness, testified contrary to the defendant's claim that he never pulled out his weapon, the trial court would be justified in finding Mr. Van Norman and the victim's testimony more credible than the defendant's testimony.

Therefore, after a review of the transcript, we find that a rational trier of fact could have found the evidence sufficient to prove that defendant intentionally used force on the victim, a former household member, by pushing her in the chest and shoulder area.

---

[3] We are mindful that the defendant in *Dufrene* was charged with domestic abuse battery, which required a finding of the intentional use of force or violence among household members.

*Id*. at 1187–88.

In the instant case and viewing the evidence in a light most favorable to the prosecution, C.B. stated Defendant pulled her pants down and said he wanted to see what the team is working with. C.B. interjected and said this felt like rape, but Defendant replied it was not rape since they were a team. C.B. testified that she froze because she was in the same place where her father killed her brother, and she was fearful of saying no to him because she thought she might also be killed. C.B. stated she tried to stop him the first time, but Defendant turned her around, then pulled her by the hand with enough force to move her into the living room against her will, while her pants were around her ankles. C.B. said she did not have enough space to run out of the house because Defendant was standing right behind her, and Defendant was a father not to question. While in the living room, Defendant told her to be still, not to move, calm down, and get comfortable. Defendant penetrated her, and C.B. said she wanted to stop, but Defendant continued and said he was going to start with the basics. Once the sexual act was over with, Defendant told her not to tell her boyfriend, and he took her underwear.

Sergeant Martin also testified as to what C.B. told her: that Defendant started talking about the swinger's club, grabbed her, pulled her towards him, pulled her pants down, placed her on top of him, and penetrated her. We find that, pursuant to *Carter*, the testimony here established that Defendant exerted force upon C.B. by pulling her pants down, pulling her by the hand against her will, and placing her on his lap on the sofa. Additionally, the testimony supports a finding that resistance was useless because Defendant had the path blocked, Defendant controlled C.B.'s movements, the jury could assess whether there was an appreciable size difference

27

between Defendant and C.B., and because of the past trauma that C.B. believed Defendant killed her brother in that same house. Although C.B. testified on cross-examination that she never directly told Defendant to stop because it would not have helped, earlier she testified that she said she wanted to stop. Furthermore, Defendant essentially confirmed that he would not have stopped based on his exchange with the prosecution. Defendant said, "I keep going to get a orgasm, to see if they get a orgasm, that's right." Defendant is heard on the recording telling C.B., "You were trying to avoid that while I was telling you that would change the mood, that would change the mindset." When viewing the evidence in the light most favorable to the prosecution, a jury could have reasonably concluded that all of the essential elements of second degree rape had been proven beyond a reasonable doubt.

Having found no merit to Defendant's insufficient evidence argument, we will now consider the remainder of his argument in his Assignment of Error One. As indicated above, Defendant argues the jury instructions improperly omitted subsection (4) of the responsive verdict of third degree rape, and this omission is fatal and cannot be harmless, as there is a reasonable probability the erroneous charge contributed to his conviction. A review of the jury instructions confirms that subsection (4) was omitted.

In reviewing Defendant's argument, we found guidance in a second circuit opinion. In *State v. Simpkins*, 44,197, 44,198, pp. 8-14 (La.App. 2 Cir. 5/13/09), 12 So.3d 1021, 1028-31, *writ denied*, 09-1229 (La. 2/5/10), 27 So.3d 296, *and writ denied*, 09-1539 (La. 3/5/10), 28 So.3d 1004 (footnotes omitted), the second circuit held:

> The court incorrectly charged the jury with the law as to aggravated rape, without objection from the parties.

. . . .

The jury heard no argument nor received any instructions about La. R.S. 14:42(A)(2). Instead, the jury heard only about La. R.S. 14:42(A)(4), the type of aggravated rape based upon the age of the child victim. The court incorrectly instructed the jury that they could convict if it was proven that FRS was under 13 when raped.

FRS had turned 13 before August 15, 2003, the effective date of the statutory amendment expanding the applicability of aggravated rape to victims who are under 13 years old at the time of the crime. See *State v. Kennedy,* 42,850 (La.App. 2d Cir.1/9/08), 974 So.2d 203; *State v. Rideout,* 42,689 (La.App. 2d Cir.10/31/07), 968 So.2d 1210. It is axiomatic that a defendant must be tried under the law in effect at the time of the crime. *State v. Weaver,* 2001–0467 (La.1/15/02), 805 So.2d 166.

In the original indictment, the state charged the defendant with the aggravated rape of FRS from May 11, 1998, through May 11, 2002; a handwritten amendment changed the latter date to May 10, 2003. The defendant did not move his family to Webster Parish until the summer of 2002, at which time FRS (DOB 5/11/90) was already 12 years old. Previous to late summer of 2002, FRS had never lived in Louisiana. The rapes continued after the family moved to Webster Parish, up to the spring of 2007, when she reported the crimes.

. . . .

In short, the victim was already 12 when she first moved from Texas to Louisiana. She turned 13 three months before the aggravated rape statute was amended to protect a class of victims under the age of 13.

Even when viewed in the light most favorable to the state, the evidence is insufficient to show that the family ever lived in Louisiana prior to FRS's 12th birthday; the evidence affirmatively shows just the opposite. Louisiana has no jurisdiction to punish a defendant for criminal acts occurring entirely in another state; only when an act or element occurred in this state does Louisiana have criminal jurisdiction. See La. Const. art. 1, § 16; La. C. Cr. P. arts. 16, 611.

The defendant did not raise this particular problem below and has not specifically raised it in this court. No motion to quash the indictment for want of jurisdiction was filed. The contemporaneous objection rule in La. C. Cr. P. art. 841 and the rule governing venue objections, La. C. Cr. P. art. 615, would normally militate against consideration of this issue on direct review. This issue is before us, however, because it is a critical error in the proceedings and because insufficiency of the evidence has been claimed. Consequently, as this

29

court stated in *State v. Speed,* 43,786[, pp. 11-12] (La.App. 2d Cir.1/14/09), 2 So.3d 582, [590] with citations omitted[, *writ denied*, 09-372 (La. 11/6/09), 21 So.3d 299]:

> Generally, a party may not assign as error a complaint to a jury charge in the absence of a contemporaneous objection. An invalid instruction on the elements of an offense is not a structural error and is therefore subject to harmless error review and only warrants reversal when the defendant is actually prejudiced by the error. An invalid instruction on the elements of an offense is harmless if the evidence is otherwise sufficient to support the jury's verdict and the jury would have reached the same result if it had never heard the erroneous instruction. The determination is based upon whether the guilty verdict actually rendered in this trial was surely unattributable to the error.

The error is not harmless; far from it. To allow the conviction for aggravated rape would effectively condone an *ex post facto* law.

There was no instruction as to any alternative theory of guilt for the crime of aggravated rape, particularly none as to La. R.S. 14:42(A)(2), a rape committed when the victim is prevented from resisting the act when the offender threatens great and immediate bodily harm, accompanied by apparent power of execution. The evidence appears to have been sufficient to convict the defendant of aggravated rape under this alternative subsection, and we recognize that a jury is not constitutionally required to agree upon a single theory to convict a defendant where it is instructed as to alternative theories. *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), *rehearing denied; State v. Allen,* 41,548 (La.App. 2d Cir.11/15/06), 942 So.2d 1244, *writ denied,* 2007–0530 (La.12/7/07), 969 So.2d 619. This jury, however, was given one theory, and it was not proven. Consequently, we lack the option of affirming this conviction under the "threats of great bodily harm" type of La. R.S. 14:42(A)(2), since this issue was never placed before the jury. As noted in *State v. Johnson,* 541 So.2d 818, 827 (La.1989), a prosecution for first degree murder:

> [W]here the evidence is insufficient to establish first degree murder under the only definition of that crime which was argued or provided to the jury, the conviction cannot be upheld based on speculation about what verdict the jury would have returned if it had been informed of a different statutory basis for concluding that the defendant's crime constituted first degree murder[.]

> In every homicide case, the prosecutor is free to attempt to establish that the defendant's conduct satisfied

any or all of the definitions of first degree murder contained in La. R.S. 14:30(A)(1)-(5). Here the prosecution chose to seek a first degree murder conviction on this charge based only on an aggravated kidnapping theory, one which was wholly unsupported by the evidence. When the prosecution chooses to limit its case in this fashion, a defendant cannot be convicted of first degree murder based on assumptions about what the jury would have found if the prosecution had presented its case differently.

We have the same situation here. The errant jury instruction presents us with a fatal sufficiency problem, which bars the retrial of the defendant under any version of La. R.S. 14:42.

The state was not required to limit its case only to the age-based section of aggravated rape. Although the error may have been common to the parties and the court, no erroneous ruling of the court prevented the state from proceeding under alternative theories of aggravated rape, which distinguishes this situation from that in *State v. Morris,* 429 So.2d 111 (La.1983) (citing *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)), where the Louisiana Supreme Court allowed a retrial because of a jury instruction error, to which the state had objected.

It is traditional for appellate courts to address the sufficiency of the evidence before addressing trial errors. Here, the trial error and sufficiency problem are intertwined and inseparable. Accordingly, the trial evidence does not support the conviction of the charge of aggravated rape, under the age-related versions of aggravated rape as it existed prior to the 13th birthday of FRS.

The proven heinous and deplorable acts committed upon FRS do allow us the option of entering a judgment of conviction for a lesser and included offense. La. C. Cr. P. art. 821. . . .

. . . .

The jury was properly charged as to the crime of forcible rape, and that responsive crime was clearly proven beyond a reasonable doubt.

FRS testified at length about the defendant's repeated threats to her life and the threat to the life of her sister in conjunction with the defendant's incessant demands for intercourse. The jury clearly found FRS to be a credible witness, and her testimony is ample to support a conviction for forcible rape for the many depraved acts practiced upon her **in Louisiana,** starting in the summer of 2002.

31

As noted in the case above, an invalid jury instruction on the elements of the offense is harmless if the evidence is otherwise sufficient to support the jury's verdict and the jury would have reached the same result if it had never heard the erroneous instruction. *Id.* As we have found that there was sufficient evidence to affirm the conviction for second degree rape, the improper jury instruction is harmless error in this case. Accordingly, it is not necessary to vacate Defendant's conviction, and Defendant's conviction is affirmed.

**ASSIGNMENT OF ERRORS TWO AND THREE:**

In his second and third assignments of error, Defendant generally claims he was denied effective assistance of counsel because his trial attorney failed to make certain objections at trial. Usually, without a contemporaneous objection, claims regarding evidence presented at trial are not reviewable on appeal. La.Code Crim.P. art. 841(A).

One way to circumvent that rule is to allege ineffective assistance of counsel for the failure to make the objection. *See generally State v.* Gage, 42,279 (La.App. 2 Cir. 8/29/07), 965 So.2d 592, *writ denied*, 07-1910 (La. 2/22/08), 976 So.2d 1283. Although ineffective assistance of counsel claims are generally discouraged on appeal, they may be considered if they can be resolved based on the record before the appellate court:

> There are two primary routes to challenge a conviction and sentence. A direct appeal is limited to the record, *see* La.C.Cr.P. art. 920, and, therefore, is not designed to address ineffective assistance of counsel claims. Claims presented on direct appeal are limited to issues which were submitted to the trial court. Because it is highly unlikely that a defendant's trial counsel would raise an ineffective assistance of counsel claim in the trial court as to his own performance, the issue is rarely submitted to the trial court (or subject to direct review on appeal). As noted in *Coleman v. Goodwin*, 833 F.3d 537, 542 (5th Cir. 2016), "[t]he Louisiana courts, as noted above, have likewise repeatedly held that ineffective assistance of trial counsel claims should typically be

32

brought in collateral proceedings, and if a claim is brought on direct appeal and the court determines that it cannot be decided on the record, the court will direct that it be brought in a collateral proceeding" and cases that do not follow this procedure appear to be outliers. Further, "Louisiana's procedural system 'makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal. . . .'" *Id*. at 543 (citations omitted). Additionally, appellate counsel rarely will be able to adequately present an ineffective assistance of counsel claim to an appellate court without first asking for a remand to have the record expanded and the issue first determined by the trial court, which, while possible, is not practical.

*State v. Harris*, 18-1012, p. 17 (La. 7/9/20), 340 So.3d 845, 856-57.

Courts examine ineffective assistance of counsel claims under a two-pronged test wherein they determine whether the attorney's performance was deficient and whether the deficiency affected the outcome of the proceeding:

A defendant is entitled to the effective assistance of counsel during both the guilt and sentencing phases. This principle is sacrosanct and is firmly ensconced in our federal and state constitutions. *See* U.S. Const. amends. VI and XIV; *see also* La. Const. art. I, § 13 . . . .

Under the standard for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by this Court in *State v. Washington*, 491 So.2d 1337, 1339 (La. 1986), a reviewing court must reverse a conviction if the defendant establishes (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. The *Strickland* test of ineffective assistance affords a "highly deferential" standard of review to the actions of counsel to eliminate, as far as possible, "the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

*Harris*, 340 So.3d at 855-56 (footnotes omitted).

A claim of ineffective assistance of counsel is analyzed under the two-prong test developed by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish his attorney was ineffective, defendant must first show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning

as the "counsel" guaranteed a defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. *Strickland, supra.* The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Cambre*, 05-888 (La.App. 5 Cir. 7/25/06), 939 So.2d 446, 460, *writ denied*, 06-2121 (La. 4/20/07), 954 So.2d 158.

Second, defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial which result is reliable. The defendant must show actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. *Strickland, supra.*

*State in the Interest of S.L.*, 11-883, pp. 16-17 (La.App. 5 Cir. 4/24/12), 94 So.3d 822, 835.

"The necessity for and specificity of evidentiary objections are governed by the Louisiana Code of Evidence." La.Code Crim.P. art. 841 (C).

**A. Effect of erroneous ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

**(1) Ruling admitting evidence.** When the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection; or

**(2) Ruling excluding evidence.** When the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel.

La.Code Evid. art. 103. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403.

## Assignment Of Error Two—Failure To Make Evidentiary Objections:

Defendant argues his trial attorney was ineffective for failing to object to evidence at trial that he describes as "unsworn[,]" "hearsay," and "character evidence[.]" Specifically:

> Admission of unsworn testimony, hearsay, and character evidence cumulatively prejudiced Reginald Jackson's right to a fair trial as to require reversal. Counsel failed to raise a single objection, and therefore the prejudice is a result of ineffective assistance of counsel. [4]

> A-Improper [a]rgument by the Assistant District Attorney that the only way to avoid conviction was for the defendant to lie about consent or intercourse;

> B-Admission of exculpatory [sic] statements by Reginald Jackson which the State used to attack the character of [A]ppellant based on his interest in a "singles club";

> C-Admission of a charge of [m]anslaughter filed against Appellant, untried, and unrelated to any consideration as 404B "Other Crimes", without any similarity or value other than to attack the character of Appellant;

> D-Admission of an audio recording of Appellant, made by the victim, which although it included inculpatory statements also was primarily a character attack on Reginal Jackson.

Defendant contends an unspecified out-of-court statement and the unspecified testimony of a detective discussing that out-of-court statement are both inadmissible hearsay, but cites no law for this proposition. Defendant argues counsel's failure to object was error because the evidence was hearsay and because of the opinions contained in the testimony. Defendant urges that his attorney's failure to object was prejudicial because it denied Defendant a fair trial.

---

[4] The case of this paragraph has been changed from ALLCAPS to improve readability.

Because this portion of Defendant's argument contains no record references, specificity, law, or legal analysis, Defendant is not entitled to relief on this general argument:

> (3) The court may disregard the argument on an assignment of error or issue for review if suitable reference to the specific page numbers of the record is not made.

> (4) All assignments of error and issues for review must be briefed. The court may consider as abandoned any assignment of error or issue for review which has not been briefed.

Uniform Rules—Courts of Appeal, Rule 2-12.4 (B)(3)-(4).

Under subsection A of this assignment of error, Defendant contends his attorney should have objected to the prosecutor's "improper" and "egregiously prejudicial" in-court implication that the only way Defendant could avoid being convicted was to lie. The statement Defendant contends his counsel should have objected to was made during the State's opening statement:

> "There's only two things that a person who is charged with this crime can defend themselves with. I call it Big Lie No. 1 or Big Lie No. 2." Big lie No. 1 is it didn't happen.

> "Big Lie No. 2 is well, once you got me and you prove that I had sex, then I can say it was consensual[.]"

Defendant asserts that this, along with the character evidence introduced in his case, prejudiced his case. Defendant advances that these comments amounted to the prosecutor becoming a witness and vouching for the credibility of the State's witnesses.

Defendant cites to *State v. Kyles*, 513 So.2d 265, 275 (La.1987), *cert. denied*, 486 U.S. 1027, 108 S.Ct. 2005 (1988), and *State v. Sharp*, 418 So.2d 1344, 1349 (La.1982), for the premise that reviewing courts can reverse convictions for improper prosecutorial remarks during closing arguments if the courts are

36

thoroughly convinced that the remarks influenced the jury and contributed to the verdict.

Defendant then cites to a passage from a federal district court case wherein the defendant's conviction was reversed where the prosecutor implied that he knew more about a witness's testimony than had been offered into evidence and that the jury should believe that witness because of the prosecutor's own personal and professional credibility:

> The prosecutor's argument implied to the jury that the prosecutor knew more about the nature of A.P.'s testimony than what he had offered into evidence at trial and that A.P.'s testimony was credible based on his own personal and official credibility. Thus, although the prosecutor's argument may have been offered during rebuttal, it was unreasonable for the state court to conclude that such comments were within the bounds of a proper rebuttal.

*Burkett v. Quarterman*, No. H-07-1782, 2008 WL 219511, at *7 (S.D. Tex. 2008), *affirmed by*, 379 Fed.Appx. 351 (5th Cir. 2010), *cert. denied*, 562 U.S. 1094, 131 S.Ct. 801 (2010).

Defendant next contends that the prosecutor herein basically became a witness with his remarks to the jury that he has dealt with these cases and knows the only way out is to lie. Defendant claims the prosecutor's statements were tantamount to a declaration that the proceedings are a "joke" because the outcome of trial is already determined. Defendant then cites to a passage from *United States v. Perez-Ruiz*, 353 F.3d 1, 9-10 (1st Cir. 2003), *cert. denied*, 541 U.S. 1005, 124 S.Ct. 2058 (2004), that discusses the impermissibility of a prosecutor imparting his/her personal belief in a witness's credibility or implying to the jury that the jurors should believe the prosecution's evidence because the government is trustworthy. In summary, Defendant claims the prosecutor's classification of his defenses to the allegations against him as "big lies" was misleading, prejudicial beyond reason, and turned "the

37

trial into a mockery of justice" by urging the jury to abandon its duty to assess credibility and to believe the government without regard to the weight of evidence presented.

Thus, Defendant argues his attorney's performance was deficient in failing to object to improper prosecutorial remarks during its opening statement. Defendant urges the objection should have asserted the prosecutor was improperly telling the jury that the defense should not be believed and that the prosecution should be believed simply because it was acting on behalf of the government. Defendant then contends his attorney's failure to object prejudiced his case enough to warrant reversal of his conviction and sentence because the remarks influenced the jury and contributed to the verdict.

In response, the State asserts its opening statement was appropriate and contained no inappropriate remarks. The State argues, as such, that Defendant failed to prove either deficient performance or prejudice.

While Defendant cites to two brief remarks made by the State during opening statements, we have reviewed the context of those comments as well. The passage below reveals the context of those comments:

> You're going to hear from the officers of the Opelousas Police Department. They take C[.B.] in. They take her statement. They make sure that she's telling the truth. They hear, but they have a tough interview with her, because they're not there just to take an allegation that's not true and just arrest somebody. They traverse her account. They push it and prod it to see if there's any problem with it. They want details, because they won't arrest someone, they will not put a person through the process that we're going through now, until they're convinced. After they push and they prod, they're convinced, and they arrest the defendant, Reginald Jackson.
>
> When they arrest Mr. Jackson, just in case they made a mistake, just in case they did not push or p[r]od enough, they ask him, "Would you like to tell us your side of the story?" Now, this is where the case gets interesting. There's only two things that a person, who is charged

38

with this crime, can defend themselves with. I call it Big Lie No. 1 or Big Lie No. 2.

Big Lie No. 1 is that it didn't happen, I never had sex with the victim. Whoever is making up this allegation against me, is doing it because they're trying to blackmail me, or they wanted money and I wouldn't give it to them, or they wanted drugs and I wouldn't give it to them, or somehow they're making up this allegation against poor old me. We never had sex. Period.

I call it Big Lie No. 1, because that's the big lie that this defendant told the police. He's interviewed for hours. Hours. You're going to see the evidence, where the police are trying, "Just tell us. We know that sexual intercourse happened. We know that No. 1 happened. We know that there was a connection between your body and her body. Just tell us what-- give us something." And he sticks to the big lie.

The reason it's a big lie is not because I say so. Judge just told you what the lawyers say doesn't matter, at this stage of the process. You're going to find out for yourself if it's a big lie. The way you're going to find out that it's a big lie is because the police keep working.

They collect the clothes that the victim was wearing, and they send those pants off to the Acadiana Crime Lab, and guess what they find? The Crime Lab does scientific analysis, DNA Analysis, and they find a unique profile, very unique, it's called a mixed profile, meaning it didn't come from just one person. Now, we would naturally expect to find [C.B.]'s DNA inside of her pants and on her pants, but what the Crime Lab found was there was a mixed profile.

You're going to hear from the Crime Lab Tech. They're going to tell you they found the defendant's DNA mixed with the victim's DNA, located in the crotch of the victim's pants. So we know the big lie "that we never had sex" is untrue, because their DNA is mixed in her crotch of her pants. But even in spite of that evidence, the defendant, when he talked to the Opelousas Police Department, still told a big lie.

What's even more damaging, and going to convince you that it's a big lie, is that even if we didn't have the DNA evidence, [C.B.] knew she needed evidence, because she was worried that people would not believe her, because it's a family member. So she goes back to Mr. Jackson's house the next day, she pulls out one of these. She takes him to a doctor's appointment, and she presses record. She talks to him about what happened yesterday. You're going to hear from Mr. Jackson, that what he told the Opelousas Police Department, the big lie that No. 1 never happened, that we never had sex, is being made up. He talks about what happened in very graphic detail. He talks about what happened. He says what happened. You're going to hear him. Don't take my word for it. Listen with your own ears. So we know that,

number one, that there was sexual intercourse, vaginal sexual intercourse between the defendant and the victim happened, because he's going to tell you, his o[w]nself, in his own words.

I told you there was two ways to defend yourself against this kind of allegation. Big Lie No. 1 or Big Lie No. 2. Big Lie No. 2 is well, once you got me and you can prove that I had sex, then I can say it was consensual. We had sex, that's why my DNA is in the crotch, mixed with her DNA in her jeans, because it was consensual; so that's why the DNA is mixed in the crotch of her jeans, because we agreed to have sex. You move from Big Lie No. 1 to Big Lie No. 2.

The reason that we know, and I'm going to show you that Big Lie Na. 2 is still a lie, because one, why is it if two people are having consensual sex, and then there is DNA inside the crotch of the pants of the victim, why is that mixed DNA even in the crotch of the jeans? You would expect that if two people have sex and it's consensual, and it's time to go home, that you get dressed, because it's consensual, and you put on your underwear and then your jeans. You're going to hear in this trial, that there was no DNA evidence found in the underwear of the victim. And you would say, wait a minute, if it's in the crotch of jeans, shouldn't it be in the underwear of the victim? Well, the reason that it was not, you're going to hear, the reason why it was not in the crotch of the underwear, because after the act happened, Mr. Jackson says, "You're not leaving here with them underwear. You're not leaving here with them underwear."

If a person freely had sex with you, then there's no reason to confiscate their underwear. I mean think about it, why would a person confiscate somebody's underwear if they had voluntary sex? "You're not leaving here with those underwear." So, she had to put on the jeans with no underwear. You don't do that if it's consensual sex. You don't do that if it's consensual sex.

Contrary to Defendant's assertions, when considered in context, the prosecution was informing the jury about the defenses Defendant intended to use at trial and the evidence the State intended to present to negate Defendant's strategy. We see no indication that the prosecutor implied that he had more information than what would be presented at trial, that the jury should believe the State's witnesses because of the prosecutor's personal or professional credibility, or that the jurors should find Defendant guilty, regardless of the evidence, simply because the government is trustworthy. Therefore, we find that Defendant failed to establish a

deficient performance on behalf of his attorney for failure to object to these comments.

Under subsection B of this assignment of error, Defendant claims his lawyer's performance was deficient because he did not object to the State's use of Defendant's interest in a "singles club" to attack Defendant's character. Defendant's brief cites to no record reference for this particular remark. Defendant further protests the admission of the following information: Defendant's denial of having sex with C.B. during his police interview, the State eliciting an answer from the testifying officer that he felt that Defendant had been untruthful, as well as the ensuing testimony wherein the officer discussed C.B.'s statement and gave his impressions and conclusions about C.B.'s statement. Defendant contends his trial attorney erred in failing to object to the State's focus on character evidence or to the police testifying that Defendant had been lying, though Defendant provides no record references in support. Defendant also asserts C.B.'s out-of-court statements and police interviews were inadmissible, and the admission of that evidence allowed the police to vouch for C.B.'s character. Defendant further implies that the physical evidence, by itself, would have been insufficient to convict Defendant.

In reply, the prosecution notes the defense's failure to brief the issue but provides an argument on the merits in opposition to Defendant's assertions.

Defendant cites no law or jurisprudence and gives no legal analysis supporting a finding of inadmissibility or giving the basis upon which any objection by his attorney should have been based. Therefore, Defendant failed to show his attorney's performance was deficient for the failure to object to the evidence mentioned in this subsection.

41

Under subsection C of this assignment of error, Defendant claims his lawyer's performance was deficient in failing to object to the State's use of his pending manslaughter charge as evidence against Defendant. Defendant asserts the manslaughter allegation was inadmissible under La.Code Evid. art. 404(B). Defendant explains that he has a pending manslaughter charge for the 2019 death of Defendant's son. At trial, C.B. testified that she feared Defendant because of the manslaughter charge, and she did not otherwise testify that Defendant used threats or violence during the offense against her.

Defendant concedes his attorney objected to the admission of the manslaughter charge, and the trial court sustained the objection but ruled it was admissible to show that the knowledge of the allegations induced fear that affected C.B.'s state of mind. Defendant contends that the use of the manslaughter charge "was clearly prejudicial and improper." Defendant speculates the information that Defendant was accused of killing his son enraged the jury.

Defendant points out Sergeant Martin testified that she believed C.B.'s report and arrested Defendant because she believed C.B. did not resist because of the threat of force or violence. Defendant then claims his trial attorney's "failure to object and oppose any discussion of a [m]anslaughter [was] a terrible mistake." Defendant argues that the manslaughter was not admissible as other crimes evidence because it did not show Defendant's lustful disposition.

The State responds that, at trial, Defendant was bound by law of the case because the trial court conducted a La.Code Evid. art. 404(B) hearing prior to trial and because defense counsel failed to contest that ruling. The prosecution further argues that the evidence was admissible under La.Code Evid. art. 404(B).

Defendant is correct that the evidence of Defendant's pending manslaughter charge does not appear to be admissible under La.Code Evid. art. 404(B)(1):

> **B. Other crimes, wrongs, or acts.** (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

However, Defendant fails to address the admissibility of the manslaughter charge under other articles allowing for admission of other crimes evidence:

> A. When an accused is charged with a crime involving abusive behavior against a family member . . ., evidence of the accused's commission of another crime, wrong, or act involving assaultive behavior against a family member . . . may be admissible and may be considered for its bearing on any matter to which it is relevant, subject to the balancing test provided in [La.Code Evid.] Article 403.
>
> . . . .
>
> C. This Article shall not be construed to limit the admissibility or consideration of evidence under any other rule.
>
> D. For purposes of this Article:
>
> (1) "Abusive behavior" means any behavior of the offender involving the use or threatened use of force against the person or property of a family member . . . of the alleged offender.
>
> . . . .
>
> (3) "Family member" means . . . children[.]

La.Code Evid. art. 412.4.

In *State v. Thomas*, 19-582, pp. 14-15 (La.App. 5 Cir. 7/29/20), 300 So.3d 517, 527, *writ denied*, 20-1503 (La. 3/2/21), 311 So.3d 1053 (footnotes omitted), the fifth circuit discussed the application of La.Code Evid. art. 412.4 and held that there

was no need for the prior abusive behavior to be similar to the offense it was being used to support:

> Though little jurisprudence exists regarding the application of La. C.E. art. 412.4, in 2001, the Louisiana legislature enacted a similar provision, La. C.E. art. 412.2, which allows the admission of evidence in sex offense cases of other crimes, wrongs or acts involving sexually assaultive behavior or which indicate a lustful disposition toward children. In *State v. Wright*, 11-141 (La. 12/6/11), 79 So.3d 309, 317, the Louisiana Supreme Court pointed out that in enacting La. C.E. 412.2, "the Legislature did not see fit to impose a restriction requiring such evidence to meet a stringent similarity requirement for admissibility." La. C.E. art. 412.2 was enacted to loosen restrictions on other crimes evidence. *Id*. at 317; *State v. Evans*, 19-237, p. 9 (La. App. 5 Cir. 6/3/20), 298 So.3d 394. Thus, pursuant to La. C.E. art. 412.2, evidence of a prior sexual offense indicating that the defendant has a lustful disposition toward children is admissible if relevant and if the probative value outweighs the prejudicial effect. *Id*.

> Considering the similarity between La. C.E. arts. 412.2 and 412.4, we find that evidence of prior acts of domestic abuse and cruelty to juveniles is also admissible if relevant and the probative value outweighs the prejudicial effect. The admissibility of evidence under this article is not limited to those actions that are identical or similar in nature to the charged crime. *See* Louisiana Practice Evidence Art. 412.4, Evidence of Similar Crimes, Wrongs, or Acts in Domestic Abuse Cases and Cruelty Against Juveniles Cases (2019 ed.).

As the instant charge would qualify as "abusive behavior"[5] against a "family member" and as the manslaughter was an "abusive behavior" against a fellow "family member" of which C.B. had knowledge, which happened in the same place as the instant incident, and which involved the same perpetrator, the evidence would be admissible under La.Code Evid. art. 412.4. The manslaughter, along with C.B.'s knowledge thereof, were highly probative to the determination of whether C.B. felt she was prevented from resisting due to the threat of physical violence and whether

---

[5] Under La.R.S. 14:42.1(A)(1), proof of second degree rape in this case requires evidence of force or the threat of physical violence.

C.B. reasonably believed her resistance would not prevent the rape. *See* La.R.S. 14:42.1(A)(1).[6]

Thus, we find Defendant failed to establish that his attorney's failure to issue an additional objection to the introduction of the manslaughter charge under La.Code Evid. art. 404(B) constituted a deficient performance.

Under subsection D of this assignment of error, Defendant claims the admission of the audio recording made by C.B. was inadmissible because, although it contained inculpatory statements by Defendant, it was primarily character evidence as the conversation was more about Defendant's interest in a "sex club" or a "social club." The State responds that the recorded inculpatory statements made by Defendant were admissible as an exception to the hearsay rule.

Defendant does not attach an ineffective assistance of counsel for failure to object argument to this claim. Defendant also does not attach any record references, law, jurisprudence, or legal analysis to this claim. Therefore, Defendant has failed to sufficiently assert an ineffective assistance of counsel claim under this subsection.

For the foregoing reasons, we find that Defendant is not entitled to relief based on his second assignment of error.

## Assignment of Error Three—Failure to Object to Investigator's Opinions:

Defendant claims ineffective assistance of counsel for failure to object to the investigators' opinions regarding C.B.'s out-of-court statements and that said failure to object denied Defendant's right to confront and cross-examine witnesses. Specifically, Defendant asserts:

> Introduction of unsworn, out of court statements and opinions of investigators as to the veracity of witnesses is patent error, and the

---

[6] The second degree rape provision does not require the accused to verbally threaten physical violence; it only requires there to be a threat of physical violence. La.R.S. 14:42.1(A)(1).

45

failure to object in this case is ineffective assistance of counsel sufficient for this court to vacate the conviction. The right to confrontation is fundamental and cannot be harmless error in this case when the de[]facto waiver occurs because of ineffective counsel.[7]

A-Unsworn out of court statements by the alleged victim whose interview included coaching by law enforcement for an extensive period, including correcting her various statement[s] so her story was consistent with other witnesses.

B-Investigators poured unsworn hearsay into the record, denying [c]ross [e]xamination without objection from the defense, vouching for the victim and assessing that she was afraid of her father so she was "threatened."

Under subsection A of this assignment of error, Defendant generally contends Sergeant Martin's testimony relaying snippets of C.B.'s out-of-court statements, her opinions regarding the validity of C.B.'s account of events, the introduction of the recording of C.B.'s interview with police, and the revelation of information about Defendant's membership in a "swinger's club" violated Defendant's right to confrontation. Defendant alleges his attorney made no objection to this information, violating Defendant's right to confrontation, and asserts his trial counsel should have made that objection.

Defendant cites no legal authority to support his general claims that his attorney's failure to object to Sergeant Martin's testimony relaying snippets of C.B.'s out-of-court statements, to the introduction of the recording of C.B.'s interview with police, and to the revelation of information about Defendant's membership in a "swinger's club" constituted a deficient performance because they violated Defendant's right to confrontation. As such, Defendant is not entitled to relief in relation to those general claims.

---

[7] The case of this paragraph has been changed from ALLCAPS to improve readability.

Defendant does make some indirect arguments that Sergeant Martin's vouching for C.B.'s credibility violated his right to confrontation because it removed the jury's ability to determine credibility. In response, the State argues that Sergeant Martin's statements were admissible to show why she took a certain course of conduct, and that the State did not introduce the evidence to prove the truth of the matter asserted.

Police officers are allowed to express relevant opinions based upon their perceptions:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> (1) Rationally based on the perception of the witness; and
>
> (2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

La.Code Evid. art. 701.

In *State v. Carter*, 10-614, pp. 12-13 (La. 1/24/12), 84 So.3d 499, 512-13, *cert. denied*, 568 U.S. 823, 133 S.Ct. 209 (2012), the supreme court, citing to prior decisions, held that an officer who witnessed a defendant's statement could comment on whether that officer believed the defendant was being truthful when he gave that statement:

> Despite defendant's claim, Deputy Jacobs's comment that defendant was lying in his statement was otherwise admissible as an opinion rationally based on Jacobs's first-hand perceptions. La.C.E. art. 701; *State v. Moses*, 367 So.2d 800, 805-06 (La.1979)(officer's opinion as to whether witness's answers were responsive, whether statement seemed sincere, and whether statement sounded made-up were admissible common sense inferences based on observation and experience); *State v. Myers*, 02-1296, pp. 8-10 (La.App. 3 Cir. 3/5/03), 839 So.2d 1183, 1189-90, *writ denied*, [03-991 (La. 10/10/03), 855 So.2d 330] (officer's opinion that defendant's statement was "bogus" admissible when not a comment on defendant's guilt); *State v. Debrow*, 34,161, pp. 12-13 (La.App. 2 Cir. 3/2/01), 781 So.2d 853, 863 (officer's

47

opinion testimony admissible where based on experience as law enforcement officers and given in direct response to defense attempts to attack credibility).

Recently, this court in *State v. Jimmerson*, 21-742 (La.App. 3 Cir. 9/28/22), ___ So.3d ___, found that lay witness testimony from a police sergeant regarding the credibility of the victim was inadmissible. In *Jimmerson*, the testifying officer was "in the observation room" during the victim's interview but did not personally interview the victim. *Id*.

In the current case, unlike *Jimmerson*, Sergeant's Martin was the interviewing officer who testified as to why she went forward with Defendant's arrest. Sergeant Martin spent a full day interviewing both C.B. and C.B.'s boyfriend and comparing their statements for inconsistencies. Thus, Sergeant Martin's opinion was based on her first-hand perceptions as the interviewer, and she gave the jury the reasons for her opinion.

Considering the above, Defendant failed to establish that his trial attorney's failure to raise a right to confrontation objection to Sergeant Martin's testimony regarding whether she believed C.B.'s report to police and why she believed C.B. was being sincere in giving that report constituted a deficient performance. Therefore, Defendant is not entitled to relief under this subsection.

Under subsection B of this assignment of error, Defendant alleges the unsworn out-of-court interview statements by C.B. included lengthy coaching by law enforcement to correct her previous statements to be consistent with those given by other witnesses. Defendant points out that C.B. stayed with Sergeant Martin throughout her workday and that Martin went back and forth between C.B. and her boyfriend to determine if their stories matched in an effort to make sure they were telling the truth and giving accurate facts. Defendant additionally states that, during

opening statements, the State described the long interrogation of C.B. during which law enforcement became convinced of the allegations against Defendant. Defendant asserts in brief that the State essentially explained that the interrogation was used "as a lie detector[.]" Defendant asserts that he was prejudiced by the repeated endorsement of C.B.'s credibility and adds that his attorney did not object.

In reply, the State points out Defendant failed to allege or argue the grounds upon which Defendant's trial counsel should have objected.

Defendant cites to no law or jurisprudence as the basis for any such objection and performs no legal analysis showing how an objection would have resulted in the suppression of evidence. Moreover, Defendant fails to either allege or demonstrate prejudice resulting from the failure to object; Defendant makes no allegation or argument that such an objection would have resulted in his acquittal or a lesser conviction. As a result, Defendant is not entitled to relief under this subsection.

Under subsection C of this assignment of error, Defendant contests the unopposed admission of "unsworn hearsay," which denied Defendant's right to cross-examination and the introduction of other witnesses' testimony vouching for C.B. and opining that C.B. was threatened because she was afraid of Defendant. Defendant explains Officer Peterson testified to having known C.B. since she was in high school in his capacity as a DARE officer; Officer Peterson then reported C.B. told him she had been raped and was afraid.

Defendant also points out that Officer Yolanda Lewis, who was dispatched to see C.B., described C.B. as being very upset, as reporting a claim of sexual touching, and as having recorded Defendant's confession because C.B. did not think anyone would believe her.

49

Defendant then notes Sergeant Ebony Martin testified that she validated the information given to law enforcement by C.B. and that she recorded the interview with C.B. The State introduced the recording into evidence and played it for the jury. Defendant states that Sergeant Martin then summarized and interpreted C.B.'s statements during the interview. Sergeant Martin ultimately testified she determined she had enough information to arrest Defendant based on C.B.'s interview because she believed C.B.'s report that C.B. did not resist because of a threat of force or violence.

Defendant urges the State's witnesses focused on showing that C.B. was afraid of Defendant despite C.B.'s failure to accuse Defendant of violence or explicit threats. Defendant asserts that C.B. being afraid of Defendant was inconsistent with her actions the following day in driving Defendant to the doctor with her child in the back seat. Without stating law or legal precedent, Defendant declares Sergeant Martin's testimony regarding her belief that C.B. did not resist because of threat of force or violence was "clearly inadmissible and the failure to object was fatal to any defense."

Defendant then challenges the method law enforcement used to compare C.B.'s complaint to police with what she told her boyfriend. Defendant asserts the officers would confront C.B. with a seemingly conflicting statement by her boyfriend and allow C.B. to explain why what she told her boyfriend differed from what she was reporting to law enforcement. Defendant classifies this as "coaching" or "woodshedding." Defendant contends that the officers' methods of allowing C.B. to explain away the inconsistencies added to C.B.'s credibility to such an extent that it removed the jury from the process of the trial.

The prosecution responds that this subsection is a restatement of Defendant's previous arguments.

Again, Defendant does not explain, cite to, or argue the legal basis for any objection his attorney should have made. Therefore, Defendant fails to allege deficient performance by his attorney. Also, Defendant fails to allege, argue, or demonstrate that his attorney's objection would have resulted in Defendant's exoneration or conviction for a lesser offense. Therefore, Defendant has failed to sufficiently assert an ineffective assistance of counsel claim under this subsection.

Accordingly, Defendant is not entitled to relief based on his third assignment of error.

**DECREE:**

For the foregoing reasons, Defendant's conviction for second degree rape is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.